Supreme Court, U.S.
F I L E D

07 - 2 0 8 AUG 1 5 2007

No. 07-___ OFFICE OF THE CLERK

___

IN THE

## Supreme Court of the United States

___

STATE OF INDIANA,

*Petitioner*,

v.

AHMAD EDWARDS,

*Respondent.*

___

**On Petition for Writ of Certiorari
to the Supreme Court of the State of Indiana**

___

**PETITION FOR WRIT OF CERTIORARI**

___

Office of the Indiana
 Attorney General
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-6201

*\*Counsel of Record*

STEVE CARTER
Attorney General
THOMAS M. FISHER*
Solicitor General
JULIE A. HOFFMAN BRUBAKER
JUSTIN F. ROEBEL
Deputy Attorneys General

*Counsel for Petitioner*

i

## QUESTION PRESENTED

May a criminal defendant who, despite being legally competent, is schizophrenic, delusional, and mentally decompensatory in the course of a simple conversation, be denied the right to represent himself at trial when the trial court reasonably concludes that permitting self-representation would deny the defendant a fair trial?

ii

# TABLE OF CONTENTS

QUESTION PRESENTED ............................................... i

TABLE OF AUTHORITIES ........................................... iii

PETITION FOR WRIT OF CERTIORARI...................... 1

OPINIONS BELOW ........................................................ 1

JURISDICTION............................................................... 1

CONSTITUTIONAL PROVISIONS INVOLVED.......... 1

    U.S. Const. amend. VI ............................................... 1

    U.S. Const. amend. XIV, § 1 ...................................... 2

STATEMENT.................................................................. 2

REASONS FOR GRANTING THE PETITION .............. 11

    I.   There is a Conflict Among Federal Circuits
       and State Supreme Courts over Whether
       Legally Competent but Mentally Impaired
       Criminal Defendants May Be Denied
       Self-Representation............................................... 11

    II.  Review is Warranted because Allowing
       the Mentally Impaired to Represent
       Themselves at Trial Erodes the Integrity
       of the Criminal-Justice System ............................. 19

    III. Edwards was Twice Found Incompetent
       Even to Stand Trial, Which Makes this an
       Excellent Case for Considering Whether
       Courts May *Ever* Deny Defendants Self-
       Representation at Trial.......................................... 25

CONCLUSION ............................................................... 26

iii

## TABLE OF AUTHORITIES

### CASES

*Alston v. State*, 894 So.2d 46 (Fla. 2004)..............................17

*Brooks v. McCaughtry*, 380 F.3d 1009 (7th Cir. 2004) .......13

*Bundy v. Dugger*, 816 F.2d 564 (11th Cir. 1987) ...............21

*Bundy v. Dugger*, 850 F.2d 1402 (11th Cir. 1988) ..............21

*Carrillo v. State*, 2006 WL 2925378
(Tex. Crim. App. 2006)....................................................18

*Commonwealth v. Barnes*, 504 N.E.2d 624
(Mass. 1987)....................................................................14

*Commonwealth v. Jermyn*, 709 A.2d 849 (Pa. 1998) ....17, 18

*Commonwealth v. Pamplona*, 789 N.E.2d 160
(Mass. App. Ct. 2003) ...............................................14, 15

*Commonwealth v. Simpson*, 704 N.E.2d 1131
(Mass. 1999)..............................................................14, 15

*Commonwealth v. Starr*, 664 A.2d 1326 (Pa. 1995)............16

*Dunn v. Johnson*, 162 F.3d 302 (5th Cir. 1998)..................16

*Dusky v. United States*, 362 U.S. 402 (1960)............... *passim*

*Edwards v. Commonwealth*, 644 S.E.2d 396
(Va. Ct. App. 2007)........................................................18

*Edwards v. State*, 854 N.E.2d 42 (Ind. Ct. App. 2006)..........1

*Edwards v. State*, 866 N.E.2d 252 (Ind. 2007) ......................1

*Ex parte Mines*, 26 S.W.3d 910
(Tex. Crim. App. 2000) ..................................................16

*Faretta v. California*, 422 U.S. 806 (1975) ................. *passim*

*Fleck v. State*, 956 So.2d 548 (Fla. Ct. App. 2007) .............17

iv

## CASES (cont'd)

*Folsom v. Franklin*, 2007 WL 1445920
(10th Cir. 2007) ...............................................................17

*Ford v. Wainwright*, 477 U.S. 399 (1986) ...........................19

*Godinez v. Moran*, 509 U.S. 389 (1993) ..................... *passim*

*Gregg v. State*, 833 A.2d 1040 (Md. 2003)...........................14

*Hauck v. State*, 36 P.3d 597 (Wyo. 2001)............................14

*In re Fleming*, 16 P.3d 610 (Wash. 2001)............................16

*Johnson v. State*, 17 P.3d 1008 (Nev. 2001) ........................17

*Lamar v. State*, 598 S.E.2d 488 (Ga. 2004) .........................16

*Martinez v. Court of Appeal of Cal.*,
528 U.S. 152 (2000) ..................................................10, 24

*Massey v. Moore*, 348 U.S. 105 (1954) ...............................11

*Maynard v. Boone*, 468 F.3d 665 (10th Cir. 2006)..............17

*McKaskle v. Wiggins*, 465 U.S. 168 (1984) .........................10

*Moon v. Superior Court*, 36 Cal. Rptr. 3d 854
(Cal. Ct. App. 2005) .......................................................17

*Moore v. State*, 999 S.W.2d 385
(Tex. Crim. App. 1999) ...................................................18

*Panetti v. Cockrell*, 2003 WL 21756365 (5th Cir. 2003) ....21

*Panetti v. Quarterman*, __ U.S. __,
127 S. Ct. 2842 (2007) ........................................19, 20, 21

*People v. Blaylock*, 2006 WL 330557
(Cal. Ct. App. 2006) .......................................................17

*People v. Coleman*, 660 N.E.2d 919 (Ill. 1995)...................17

*People v. F.J.*, 2006 WL 3291759
(Cal. Ct. App. 2006) .......................................................17

v

### CASES (cont'd)

*People v. Houston*, 2007 WL 1519548
(Cal. Ct. App. 2007) ........................................................17

*People v. Jackson*, 2007 WL 754749
(Cal. Ct. App. 2007) ........................................................17

*People v. Lego*, 660 N.E.2d 971 (Ill. 1995) ........................14

*People v. Lyles*, 2007 WL 1519778
(Cal. Ct. App. 2007) ........................................................17

*People v. Pullett*, 2006 WL 1731300
(Cal. Ct. App. 2006) ........................................................17

*People v. Reyes*, 2006 WL 416949
(Cal. Ct. App. 2006) ........................................................17

*People v. Robinson*, 2007 WL 1536786
(Cal. Ct. App. 2007) ........................................................17

*People v. Smith*, 2004 WL 1057741
(Mich. Ct. App. 2004) ......................................................17

*People v. Welch*, 976 P.2d 754 (Cal. 1999) ........................14

*People v. Woods*, 931 P.2d 530 (Colo. Ct. App. 1996)........14

*Shafer v. Bowersox*, 329 F.3d 637 (8th Cir. 2003)...............15

*Sobey v. Britten*, 2007 WL 1291085 (D. Neb. 2007)...........17

*Souza v. United States*, 2006 WL 3692921
(N.D. Ohio 2006)..............................................................17

*State v. Arguelles*, 63 P.3d 731 (Utah 2003).................12, 14

*State v. Bean*, 762 A.2d 1259 (Vt. 2000) ............................18

*State v. Briggs*, 787 A.2d 479 (R.I. 2001)...........................13

*State v. Camacho*, 561 N.W.2d 160 (Minn. 1997)...............16

*State v. Caracoglia*, 895 A.2d 810
(Conn. Ct. App. 2006) ......................................................17

vi

## CASES (cont'd)

*State v. Cassell*, 590 S.E.2d 333 (N.C. Ct. App. 2004)........17

*State v. Day*, 661 A.2d 539 (Conn. 1995)............................16

*State v. Gauthier*, 941 So.2d 642 (La. Ct. App. 2006).........17

*State v. Jordan*, 804 N.E.2d 1 (Ohio 2004).........................16

*State v. Khaimou*, 1998 WL 747138
  (Minn. Ct. App. 1998).....................................................17

*State v. Klessig*, 564 N.W.2d 716 (Wis. 1997) ..............12, 13

*State v. Marquardt*, 705 N.W.2d 878 (Wis. 2005)..............18

*State v. Pollard*, 657 A.2d 185 (Vt. 1995) ..........................18

*State v. Pruitt*, 2004 WL 3017252
  (Ohio Ct. App. 2004).......................................................17

*State v. Rater*, 568 N.W.2d 655 (Iowa 1997)......................16

*State v. Raymond*, 563 N.W.2d 823 (S.D. 1997) ................16

*State v. Thomas*, 794 A.2d 990 (R.I. 2002).........................13

*State v. Turner*, 2000 WL 674583
  (Tenn. Crim. App. 2000).................................................16

*State v. Wise*, 879 S.W.2d 494 (Mo. 1994).........................16

*United States v. Boigegrain*, 155 F.3d 1181
  (10th Cir. 1998) ..............................................................16

*United States v. Ellerbe*, 372 F.3d 462
  (D.C. Cir. 2004)..............................................................15

*United States v. Erskine*, 355 F.3d 1161
  (9th Cir. 2004) ................................................................24

*United States v. Frazier-El*, 204 F.3d 553
  (4th Cir. 2000) ..........................................................15, 16

*United States v. Hernandez*, 203 F.3d 614
  (9th Cir. 2000) ..........................................................16, 24

vii

## CASES (cont'd)

*United States v. Lazo-Romero*, 2007 WL 1545184
   (9th Cir. 2007) ...................................................................17

*United States v. Peppers*, 302 F.3d 120 (3d Cir. 2002) .......15

*United States v. Zedner*, 193 F.3d 562 (2d Cir. 1999) .........17

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VI ...........................................................1

U.S. Const. amend. XIV, § 1 .................................................2

## FEDERAL STATUTES

28 U.S.C. § 1257 ...................................................................1

## OTHER AUTHORITIES

Erica J. Hashimoto, *Defending the Right of Self-
   Representation: An Empirical Look at the Pro Se
   Felony Defendant*, 85 N.C. L. Rev. 423
   (Jan. 2007) .......................................................................22

Howard Wiit, *Inmate Granted Stay*, Chi. Trib.,
   Feb. 5, 2004, at 16, *available at* 2004 WLNR
   19909681 ....................................................................22, 23

Jessica McBride, *How Can an Insane Man Defend
   Himself?*, Milwaukee J. & Sentinel, Feb. 15, 2004,
   at J1, *available at* 2004 WLNR 4682593 .........................22

John F. Decker, *The Sixth Amendment Right to Shoot
   Oneself in the Foot: An Assessment of the Guarantee
   of Self-Representation Twenty Years After* Faretta,
   6 Seton Hall Const. L.J. 483 (Spring 1996) ...............19, 21

Ralph Blumenthal, *Insanity Question Lingers as Texas
   Execution is Set*, N.Y. Times, Feb. 4, 2004, at A12,
   *available at* 2004 WLNR 5530429 .................................22

## PETITION FOR WRIT OF CERTIORARI

The State of Indiana respectfully petitions the Court for a writ of certiorari to the Supreme Court of the State of Indiana.

## OPINIONS BELOW

The opinion of the Indiana Supreme Court is reported at *Edwards v. State*, 866 N.E.2d 252 (Ind. 2007). App. 1a-15a. The opinion of the Indiana Court of Appeals is reported at *Edwards v. State*, 854 N.E.2d 42 (Ind. Ct. App. 2006). App. 16a-31a. The trial court's decision holding that Respondent Ahmad Edwards was incompetent to represent himself at trial is unreported, but the relevant portion of the transcript is included in the Appendix. App. 32a-41a.

## JURISDICTION

The Indiana Supreme Court entered judgment in this case on May 17, 2007. The jurisdiction of this Court is invoked under 28 U.S.C. § 1257.

## CONSTITUTIONAL PROVISIONS INVOLVED

### U.S. Const. amend. VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

2

**U.S. Const. amend. XIV, § 1**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## STATEMENT

This is the unfortunate case of a mentally impaired young man who, caught shoplifting, shot an unarmed security guard and a bystander before being subdued by a passing FBI agent. He was twice declared incompetent to stand trial, but eventually regained the mental capacity to satisfy the standard of *Dusky v. United States*, 362 U.S. 402 (1960). At trial, he insisted on defending himself, but the trial judge quite reasonably said no. This case asks whether the right to self-representation recognized in *Faretta v. California*, 422 U.S. 806 (1975), extends to a defendant whose mental impairments render him wholly incapable of presenting a coherent and meaningful defense.

1. Defendant Ahmad Edwards is thirty-four-years old and suffers from grandiose delusions, schizophrenia, and depressive and expressive language disorders. (Edwards's Appeal App. [hereinafter, "Ed.App."] 145-46, 282-84, 287, 632). He was diagnosed with dyslexia as a child and his family has a long history of psychiatric illness, including a sister with schizophrenia. (Ed.App. 145-46). Additionally, in 1995, Edwards was involved in a head-on collision where his car "went under a semi-tractor trailer and then the trailer rolled over [his] car." (Ed.App. 145). Edwards suffered a closed head injury and a loss of consciousness. (Ed.App. 145).

3

Edwards has a full-scale IQ of 91, but scored as high as the 80th-90th percentile on several tests, including immediate visual memory, delayed visual memory, immediate recall of material read to him, delayed recall of material read to him, and generative phenomic naming. (Ed.App. 148). Yet Edwards scored very low on other tests, including at the bottom percentile on spelling and in the second percentile on arithmetic. (Ed.App. 148). Doctors have at times observed that Edwards's thought process "is extremely tangential and decompensates in the course of a conversation." (Ed.App. 149). They have also said that his writings are "hard to follow, not connected, and his thoughts are not following in a logical fashion." (Ed.App. 244).

2. On July 12, 1999, Edwards took a pair of shoes from a department store in downtown Indianapolis without paying. App. 17a-18a. The store's loss-prevention officer, who was not armed, tackled Edwards outside the store on a city sidewalk. App. 18a. During the confrontation, Edwards drew a 40-caliber handgun and fired three times. App. 18a. The bullets struck the right leg of a bystander and grazed the loss-prevention officer. App. 18a. Edwards fled. App. 18a. An FBI agent who happened by chased Edwards into a parking garage. App. 18a. The agent identified himself and ordered Edwards to raise his hands, but Edwards pointed his gun at the agent's face. App. 19a. The agent repeatedly yelled, "drop the gun," but when Edwards failed to comply with his orders, the agent ultimately drew his own weapon and fired at Edwards, striking him in the thigh. App. 19a. Edwards fell to the ground and was taken into custody. App. 19a.

The State charged Edwards with attempted murder, battery with a deadly weapon, criminal recklessness, and theft. App. 17a. He was initially incarcerated in the Marion County Jail, unable to post the $30,000 bond for his release. (Ed.App. 5, 130). The trial court appointed a public

4

defender to represent Edwards, but while awaiting trial, Edwards personally wrote to the judge attempting to plead guilty to battery and criminal recklessness and moving to dismiss counsel. (Ed.App. 7, 118-20). During this same period, Edwards frequently sent other letters to the court, apprising the judge of Edwards's charitable work, achievements, and future goals, including his "exceptance in a magnate program selected from 5000 as one of 5," and his being "offered job with dupety sheriff's of Indianapolis Indiana." (Ed. App. 99-102).

3. On December 7, 1999, Edwards's public defender filed a motion for a competency hearing and a notice of intent to assert insanity as a defense. (Ed.App. 13, 128-29, 282). Based on her experience with Edwards, counsel believed that he lacked the ability to participate in the proceedings and to assist in the preparation of his defense. (Ed.App. 128). The court appointed Drs. Ned P. Masbaum, a neuropsychiatrist at Methodist Hospital in Indianapolis and formerly the Lieutenant Commander and Chief of Psychiatry at the United States Naval Hospital, and Dwight W. Schuster, also a neuropsychiatrist, to examine Edwards. (Ed.App. 13, 656, 662).

Drs. Masbaum and Schuster filed their reports in late December 1999. (Ed.App. 282-83). Both documented that Edwards suffered from delusional disorder "grandiose type," but concluded that, despite Edwards's delusions, he was competent to stand trial. (Ed.App. 282-83). However, Edwards's counsel had independently retained Dr. Lance E. Trexler, a neuropsychologist, who submitted a conflicting report on February 23, 2000. (Ed.App. 283). Dr. Trexler concluded that Edwards was not competent to stand trial because he displayed signs of a major thought disorder, decompensated during the course of conversations, and experienced hallucinations. (Ed.App. 283-84).

5

Based on these reports, on August 16, 2000, Marion Superior Court Judge Gary L. Miller found Edwards incompetent to stand trial and committed him to the Indiana Department of Mental Health for evaluation and treatment. (Ed.App. 168). The Department of Mental Health assigned Edwards to Logansport State Hospital. (Ed.App. 175).

Several months later, on March 14, 2001, Logansport State Hospital notified the trial court that Edwards "has attained the ability to understand the proceedings and assist in the preparation of his defense." (Ed.App. 183). In support of that finding, the Hospital's staff psychiatrist, Steven H. Berger, found that Edwards "appears to be psychiatrically normal" and is "free of psychosis, depression, mania, and confusion." (Ed.App. 185). Consequently, pursuant to a March 16, 2001 order from the trial court (Judge Grant W. Hawkins now presiding), Edwards was transported from Logansport to the Marion County Jail. (Ed.App. 187).

On June 26, 2001, however, Edwards filed, without the assistance of his court-appointed counsel, a document styled "Motion of Permissive Intervention." (Ed.App. 195-215). Part A of this document began by stating, "In the year ["1999"] nineteen hundred and nindy nine. The defendant Mr. Ahmad Edwards applyed for a job in the fifth largest shopeing mall in Indiana." (Ed.App. 196). The document continued, "To relize the existence of a genuine issue as to an material fact by interrogatories of the county Marion in Indianapolis, Indiana to help cure the vital stictics, in witch negligence was being apoximated as the cause of the exacerbation of the young American citizens of the United States in Indianapolis, Indiana injury." (Ed.App. 196-97).

In light of this "peculiar" motion, and mindful of Dr. Trexler's previous diagnosis of delusional disorder, on September 12, 2001, Edwards's counsel questioned the hospital's competency determination and moved to release

6

Edwards's Logansport State Hospital records. (Ed.App. 225-27). That same day, the trial court ordered further psychiatric testing by Drs. Masbaum and Schuster. (Ed.App. 229, 284).

In a report filed in October 2001, Dr. Masbaum found that Edwards still suffered from a delusional disorder, but understood the charges against him and could aid counsel in his defense. (Ed.App. 232-34). Dr. Schuster found that Edwards had shown significant improvement since being diagnosed as delusional in his previous evaluation, was able to understand the charges and proceedings, and was able to assist counsel with his defense. (Ed.App. 285-86). Based on these reports, in April 2002, the trial court deemed Edwards competent and set a jury trial for September 30, 2002 (Ed.App. 282-88), but later continued it until December 2, 2002. (Ed.App. 34).

Just before trial, in November 2002, defense counsel requested that Edwards be examined yet again for competency, this time by another psychiatrist of the defense's choosing, Dr. Phillip Coons. (Ed.App. 349, 355). The court approved, and in a report dated November 26, 2002, Dr. Coons diagnosed Edwards as schizophrenic and noted Edwards's history of dyslexia and substance use. (Ed.App. 352). Dr. Coons opined that Edwards could understand the charges, but was unable to assist with his defense due to schizophrenic delusions. (Ed.App. 353-54). Based on this report, on November 27, 2002, Edwards's counsel submitted a "Suggestion of Incompetency," claiming that Edwards was incapable of effective communication with counsel and that he lacked "an adequate understanding of the role of the parties to proceed to trial." (Ed.App. 409-11).

The trial court vacated the December 2, 2002, trial, but again appointed Drs. Masbaum and Schuster to examine Edwards. (Ed.App. 38). Both doctors concluded that Edwards was legally competent to stand trial. (Ed.App. 403,

7

408).   Dr. Masbaum found possible malingering, and Dr. Schuster observed no evidence "of delusional ideation or psychotic thinking."   (Ed.App. 402, 407).   The court set a competency hearing for April 29, 2003.   (Ed.App. 39).

Several months after that hearing, on November 24, 2003, the trial court again, based in part on evaluations by Drs. Coons and Trexler, found Edwards incompetent to stand trial.    App. 2a-3a.    The court ordered that Edwards be returned to the custody of the Indiana Department of Mental Health for evaluation and treatment.   (Ed.App. 439).

During Edwards's ensuing six-month stay at the Logansport State Hospital, the staff forensic psychiatrist observed that Edwards's schizophrenia included "symptoms of disorganized thought processes, delusional ideation, hallucinations, and ideas of reference."   (Ed.App. 445). Edwards was treated for schizophrenia and a depressive disorder with individual and group psychotherapy, counseling, and 300 mg/day of Seroquel, an antipsychosis medication. (Ed.App. 445, 450-551).

As a result of this treatment, on July 29, 2004, the Logansport State Hospital once again certified to the court that Edwards was competent to stand trial.   (Ed.App. 43, 449).   The Hospital found that Edwards "has attained the ability to understand the proceedings and assist in the preparation of his defense." (Ed.App. 449).   The supporting report, by staff forensic psychiatrist Dr. Robert Sena, stated that Edwards's mental symptoms "have greatly improved" and that he "no longer has hallucinations, delusions, and ideas of reference."   (Ed.App. 451).   The doctor further observed,    "His    thought    processes    are    no    longer disorganized." (Ed.App. 451).

Based on this report, Judge Hawkins ordered Edwards returned to the Marion County Jail on August 2, 2004. (Ed.App. 455).   Without any further competency hearing,

8

Edwards received a two-day trial on June 27-28, 2005. App. 3a. He asked to proceed *pro se*, but Judge Hawkins denied his request based "primarily on the fact that [he] wanted to proceed under the defense of insanity and that that request would have caused a continuance." App. 34a.

The jury found Edwards guilty of theft and criminal recklessness, but hung on the attempted-murder and battery-with-a-deadly-weapon charges. App. 3a. The court remanded Edwards to the custody of the Marion County Jail and withheld sentencing on the theft and criminal-recklessness convictions until after retrial on the other charges, which the court set for December 19-21, 2005. (Ed.App. 53, 59; Trial Tr. 486).

4. Prior to the second trial, Edwards formally petitioned the court to proceed *pro se*. App. 32a. The court denied Edwards's request, finding that, while Edwards was mentally competent to stand trial and to assist counsel, his delusions, schizophrenia, communication troubles, and related problems with focus rendered him incapable of self-representation. App. 36a-37a. In so ruling, the court relied on Edwards's long history of incompetence and observed that the present "finding of competence was conditioned by the doctors on the assistance of counsel." App. 39a.

In reaching this conclusion, the court no doubt had in mind (among other things) Edwards's voluminous correspondence with the court—including a crossed-out list of bedding supplies, a dress code, and a fictitious business letter. (Ed.App. 99-103, 125, 153-66, 188-223, 252-81, 289-348, 377-99, 419-34, 458-91, 553-68, 620-31, 646). As one example of this correspondence, in a "Petition for Hearing" dated November 1, 2004, Edwards urged the court to "consult, the best position to advise the groups of any, recourse that may be available established and to be action of law, certain of the rules admissions not to fail responsibilities of other officials, counterproductive resolved in the court

9

system therein any action that might be construed as
interference." (Ed.App. 488). He also wrote, in a "Motion
to Dismiss" dated December 19, 2005, "Defendant moves
the grounds of this court to dismiss this cause: if any notation
of grand avoids a bill immunity proceeding at criminal
information true-bill grounds. Defendant prays psalm 15.5
for innocent of court property to be dismissed wherefore, so
shall it be done." (Ed.App. 624).

5. Edwards's second trial proceeded as scheduled on
December 19, 2005. Edwards himself would have argued
that he fired at the unarmed loss-prevention officer in self-
defense. App. 34a-35a. However, because witnesses
unequivocally testified that Edwards had begun to walk
away from the officer before turning back to fire while the
officer lay prone on the sidewalk, his counsel jettisoned the
self-defense theory and instead argued that Edwards lacked
the requisite intent for murder. App. 35a. More specifically,
counsel contended that Edwards was trying to miss—
otherwise the officer would have been killed. As counsel put
it to the officer on cross-examination, "the only [other]
explanation is that the bullet didn't leave the barrel of that
gun and travel in a straight direction toward your head."
(Trial Tr. 166). Counsel even tried to show that the loss-
prevention officer was wrong about where Edwards was
aiming by having the officer demonstrate for the jury how
the physical confrontation played out. (Trial Tr. 144).

These efforts notwithstanding, the jury convicted
Edwards of attempted murder and battery with a deadly
weapon. App. 3a. The court sentenced Edwards on all four
convictions to the presumptive sentence on each count,
running concurrently, for a total executed sentence of 30
years. App. 3a.

6. On appeal, Edwards argued that his convictions for
attempted murder and battery with a deadly weapon were
invalid because the trial court had improperly denied

10

Edwards the right to represent himself, in violation of the Sixth Amendment. App.17a. The Indiana Court of Appeals agreed, concluding it was bound to reach this holding by *Godinez v. Moran*, 509 U.S. 389, 391 (1993). App. 17a, 24a. Still, the Court of Appeals' sentiments were with the trial court, stating that "we are entirely sympathetic to the conclusion reached by the trial court and appreciate that it was simply trying to ensure that Edwards received a fair trial." App. 24a.

On discretionary review, the Indiana Supreme Court likewise ruled that Edwards's right to self-representation had been violated, but acknowledged that the trial court's finding that Edwards was "incapable of adequate self-representation was, at a minimum, reasonable." App. 14a. Because improper denial of the right to self-representation is structural error, harmless-error analysis could not save the convictions. App. 14a; *see also McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). Accordingly, the court reversed Edwards's convictions for attempted murder and aggravated battery. App. 15a.

The Indiana Supreme Court's decision rested solely on federal law. App. 4a n.1 (refusing to address whether Edwards had a right to proceed *pro se* under the Indiana Constitution because federal law was binding); *see also* App. 13a-14a (holding that *Faretta* and *Godinez* compelled the court's result). The court observed that *Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 156 (2000), cast some doubt on the historical rationale for the right to self-representation. App. 12a-13a (citing the concurring opinions of Justices Kennedy, Breyer, and Scalia). However, it ultimately concluded that while "these separate opinions clearly acknowledge that *Martinez* cast doubt on *Faretta* . . . neither *Martinez* nor any other Supreme Court decision has overruled *Faretta* or *Godinez*." App. 13a. The court therefore rejected the State's argument that the standard for

11

competency to waive counsel should be something more than the *Dusky* standard—even though it found that argument had "some force"—because ultimately the court was "bound by United States Supreme Court precedent." App. 4a.

## REASONS FOR GRANTING THE PETITION

The Court should grant certiorari to resolve the deep conflict among the federal circuits and state courts regarding whether States may impose a higher competency standard for self-representation than the minimal competency required to stand trial under *Dusky v. United States*, 362 U.S. 402 (1960). Allowing criminal defendants such as Edwards to represent themselves undermines fair trials and erodes public confidence in criminal convictions and the criminal-justice system generally. *See Massey v. Moore*, 348 U.S. 105, 108 (1954) ("No trial can be fair that leaves the defense to a man who is insane, unaided by counsel, and who by reason of his mental condition stands helpless and alone before the court.").

## I. There is a Conflict Among Federal Circuits and State Supreme Courts over Whether Legally Competent but Mentally Impaired Criminal Defendants May Be Denied Self-Representation

Criminal defendants have the constitutional right to waive trial counsel when they "voluntarily and intelligently elect[] to do so." *Faretta v. California*, 422 U.S. 806, 807 (1975). Further, due process does not *require* criminal courts to impose a higher standard of competency to waive counsel than to stand trial—a standard that asks only whether a defendant understands the charges and is able to assist counsel. *See Godinez v. Moran*, 509 U.S. 389, 402 (1993) (citing *Dusky v. United States*, 362 U.S. 402 (1960)). However, the Court explained in *Godinez* that "*States are free to adopt* competency standards that are *more elaborate*

12

than the *Dusky* formulation," even though "the Due Process Clause does not *impose* these additional requirements." *Godinez*, 509 U.S. at 402 (emphasis added).

The "free to adopt" statement has prompted judicial disarray with respect to the right to self-representation at trial. In the wake of *Godinez*, a well-developed, growing conflict has emerged among federal circuits and state supreme courts as to whether courts may deny self-representation at trial to defendants who, though competent under *Dusky*, are functionally unable to defend themselves owing to a mental impairment. Many courts read *Godinez* to permit a different standard for waiving counsel than for standing trial, but many others read it to require the same standard as for trial competency.

### 1. Cases Reading *Godinez* to *Permit* Different Standards:

a. On one side of the conflict, some courts after *Godinez* have held—in contrast to the decision below—that States may adopt a standard for waiving counsel that is higher than the competence standard for standing trial. According to the Utah Supreme Court, because *Godinez* holds that "the minimum requirements for competency to waive assistance of counsel are no greater than the requirements for competency to stand trial . . . [s]ome states have established additional requirements for competency to waive counsel." *State v. Arguelles*, 63 P.3d 731, 751 (Utah 2003).

The Wisconsin Supreme Court, to begin, has reaffirmed its pre-*Godinez* precedent establishing a higher standard of competency for waiving counsel. *See State v. Klessig*, 564 N.W.2d 716, 724 (Wis. 1997). The court explained that Wisconsin's "higher standard" survived *Godinez* because it was not based solely on the Due Process Clause, but was "primarily" decided "on a careful contemplation of public

13

policy." *Id.* at 723. Wisconsin trial courts may deny self-representation based on "the defendant's education, literacy, fluency in English, and any physical or psychological disability which may significantly affect his ability to communicate a possible defense to the jury." *Id.* at 724.

For its part, the Seventh Circuit, in reviewing the Wisconsin standard, accepted the proposition that *Faretta* and *Godinez* leave room for States to limit the right to self-representation beyond the mere competency to stand trial. *See Brooks v. McCaughtry*, 380 F.3d 1009, 1013 (7th Cir. 2004). Judge Posner, writing for a unanimous court, concluded that "[n]o federal policy, whether found in the due process clause of the Fourteenth Amendment or anywhere else, is offended by" a State's preventing mentally impaired defendants from representing themselves, even if doing so "may allow some of its criminal defendants to whipsaw it." *Id.* at 1012. Accordingly, "we do not think that Wisconsin's approach violates the rule of *Godinez*." *Id.* at 1013.

b.  Other courts, perhaps in an attempt to avoid the harsh rule they believe *Godinez* imposes upon them, have used the "knowing and voluntary waiver" portion of the *Faretta* rule to impose a higher standard on those wishing to exercise their right of self-representation. For example, in the semblance of determining whether a defendant voluntarily, knowingly, and intelligently waived the right to counsel, Rhode Island has effectively adopted a higher standard of mental competence to waive counsel. In *State v. Thomas*, 794 A.2d 990, 994 (R.I. 2002), the court explained that it previously had "determined that a defendant is subjected to a heightened standard of competency when he attempts to waive counsel and appear *pro se*." Rhode Island trial courts may consider, among other things, "the background, the experience, and the conduct of the defendant at the hearing, including his age, his education, and his physical and mental health." *State v. Briggs*, 787 A.2d 479, 486 (R.I. 2001).

14

The Illinois Supreme Court has similarly embraced a standard for waiving counsel that incorporates mental-competency considerations beyond what *Faretta* and *Dusky* demand. In *People v. Lego*, 660 N.E.2d 971, 978-80 (Ill. 1995), the court granted post-conviction relief to a defendant who had represented himself at trial, citing the defendant's mental illness as a reason to question his capacity to make a knowing and intelligent waiver of counsel.

c.   Still other state supreme courts—those of California, Maryland, Utah, and Wyoming—have recognized that States have the freedom to apply a higher standard of competency for self-representation, but have (for the moment at least) chosen not to exercise that freedom. *See People v. Welch*, 976 P.2d 754, 777 (Cal. 1999); *Gregg v. State*, 833 A.2d 1060, 1060 (Md. 2003); *Arguelles*, 63 P.3d at 751; *Hauck v. State*, 36 P.3d 597, 602 (Wyo. 2001); *see also People v. Woods*, 931 P.2d 530, 534 (Colo. Ct. App. 1996); *Commonwealth v. Pamplona*, 789 N.E.2d 160, 164 (Mass. App. Ct. 2003).[1]

---

[1] In *Commonwealth v. Barnes*, 504 N.E.2d 624, 627-28 & n.3 (Mass. 1987), the Supreme Judicial Court of Massachusetts held that a hearing on the defendant's competence to waive counsel, and possibly a psychiatric examination, was required where there was substantial evidence of the defendant's "mental disorder or impairment." It imposed a "vaguely higher" standard of competence to waive counsel than to stand trial because "the waiver of counsel necessarily embraces an assessment of the defendant's mental capacity to conduct his own defense." *Id.* at 628 n.3. Following *Godinez*, in *Commonwealth v. Simpson*, 704 N.E.2d 1131, 1135 n.5 (Mass. 1999), the court cited *Barnes* (among other cases) with approval and said that proving a defendant's competence "to act as his own lawyer (with standby counsel) may require a greater showing than that the defendant is competent to stand trial." However, the

15

**2. Cases Reading *Godinez* to *Prohibit* Different Standards:** On the other side of the conflict, while the Seventh Circuit allows different standards for waiving counsel than for standing trial, several other federal circuits—the Third, Fourth, Fifth, Eighth, Ninth, Tenth, and D.C. Circuits—mandate use of the same standard—although they acknowledge that waiver must be knowing and voluntary. *See United States v. Ellerbe*, 372 F.3d 462, 466 (D.C. Cir. 2004) ("The Supreme Court has expressly held . . . that a defendant who is competent to stand trial is also competent to waive his right to assistance of counsel—all that is necessary is that he do so intelligently and voluntarily."); *Shafer v. Bowersox*, 329 F.3d 637, 650 (8th Cir. 2003) (finding "no distinction between the competency required to stand trial and the competency to waive constitutional rights," and allowing that mental disorder can impede a knowing and voluntary waiver only if it precludes understanding the consequences of the waiver); *United States v. Peppers*, 302 F.3d 120, 131 n.9 (3d Cir. 2002) ("[T]he standard for competency to stand trial is the same as the standard to plead guilty or to waive counsel, except that a person seeking to waive a constitutional right must also demonstrate that the waiver is knowing and voluntary."); *United States v. Frazier-El*, 204 F.3d 553, 559 (4th Cir. 2000) ("[T]he standard of competence for waiving counsel is

---

court then alluded to the knowing-and-voluntary standard and acknowledged that *Godinez* states that the constitutional standards for standing trial and for waiving trial counsel are the same. *See id.*  *Simpson* did not resolve the matter, however, as it remanded the case over defendant's *Dusky* competency. *See id.* at 1136. Then, in *Pamplona*, the Massachusetts Appeals Court seemingly applied a heightened standard for "competence to waive counsel" by considering that the defendant "conducted himself appropriately" before the court by cross-examining a witness and introducing evidence. *See Pamplona*, 789 N.E.2d at 164.

16

identical to the standard of competence for standing trial."); *Dunn v. Johnson*, 162 F.3d 302, 307-08 (5th Cir. 1998) ("The level of competence required to waive the right to counsel is the same as that required to stand trial. As we hold above, Dunn was competent to stand trial. It necessarily follows that he also was competent to waive the right to counsel."); *United States v. Hernandez*, 203 F.3d 614, 620 n.8 (9th Cir. 2000) ("[T]he Supreme Court held that a defendant's competence to waive the right to counsel is measured by the same standard under which competence to stand trial is evaluated."); *United States v. Boigegrain*, 155 F.3d 1181, 1186 (10th Cir. 1998) ("In *Godinez*, the Court held that the degree of competence necessary to waive the right to counsel is identical to the degree of competence necessary to stand trial.").

Similarly, a large group of state courts of last resort has read *Godinez*'s "free to adopt" statement only to permit a single standard for *both* competence to stand trial *and* competence to waive counsel. These courts will overturn a trial judge's decision to require counsel wherever the defendant has been deemed competent to stand trial, no matter how mentally incapable a defendant may be to defend himself. *See State v. Day*, 661 A.2d 539, 548 (Conn. 1995); *Lamar v. State*, 598 S.E.2d 488, 491 (Ga. 2004); *State v. Rater*, 568 N.W.2d 655, 660 (Iowa 1997); *State v. Camacho*, 561 N.W.2d 160, 172 (Minn. 1997); *State v. Wise*, 879 S.W.2d 494, 507 (Mo. 1994); *State v. Jordan*, 804 N.E.2d 1, 8 (Ohio 2004); *Commonwealth v. Starr*, 664 A.2d 1326, 1339 (Pa. 1995); *State v. Raymond*, 563 N.W.2d 823, 827 (S.D. 1997); *Ex parte Mines*, 26 S.W.3d 910, 912 (Tex. Crim. App. 2000); *In re Fleming*, 16 P.3d 610, 614 (Wash. 2001); *see also State v. Turner*, 2000 WL 674583, at *3-4 (Tenn. Crim. App. 2000).

\*          \*          \*

17

These distinct groups of state and federal decisions stand in direct, meaningful conflict. Many jurisdictions would have concurred with the decision below, but others would have affirmed Edwards's convictions given his history of serious mental illness, notwithstanding his technical legal competency. The table below charts this post-*Godinez* conflict, which comprises 29 jurisdictions (including three state intermediate appellate decisions). Since *Godinez*, in at least 60 cases nationwide a legally competent but mentally impaired defendant has sought to waive the right to trial counsel.[2] The issue thus remains vital, and the conflict will not abate without the Court's intervention.

---

[2]   In addition to cases already cited, *see United States v. Lazo-Romero*, 2007 WL 1545184 (9th Cir. 2007); *Folsom v. Franklin*, 2007 WL 1445920 (10th Cir. 2007); *Maynard v. Boone*, 468 F.3d 665 (10th Cir. 2006); *United States v. Zedner*, 193 F.3d 562 (2d Cir. 1999); *Sobey v. Britten*, 2007 WL 1291085 (D. Neb. 2007); *Souza v. United States*, 2006 WL 3692921 (N.D. Ohio 2006); *People v. Jackson*, 2007 WL 754749 (Cal. Ct. App. 2007); *People v. Houston*, 2007 WL 1519548 (Cal. Ct. App. 2007); *People v. Lyles*, 2007 WL 1519778 (Cal. Ct. App. 2007); *People v. Robinson*, 2007 WL 1536786 (Cal. Ct. App. 2007); *People v. Blaylock*, 2006 WL 330557 (Cal. Ct. App. 2006); *People v. Reyes*, 2006 WL 416949 (Cal. Ct. App. 2006); *People v. Pullett*, 2006 WL 1731300 (Cal. Ct. App. 2006); *People v. F.J.*, 2006 WL 3291759 (Cal. Ct. App. 2006); *Moon v. Superior Court*, 36 Cal. Rptr. 3d 854 (Cal. Ct. App. 2005); *State v. Caracoglia*, 895 A.2d 810 (Conn. Ct. App. 2006); *Alston v. State*, 894 So.2d 46 (Fla. 2004); *Fleck v. State*, 956 So.2d 548 (Fla. Ct. App. 2007); *People v. Coleman*, 660 N.E.2d 919 (Ill. 1995); *State v. Gauthier*, 941 So.2d 642 (La. Ct. App. 2006); *People v. Smith*, 2004 WL 1057741 (Mich. Ct. App. 2004); *State v. Khaimov*, 1998 WL 747138 (Minn. Ct. App. 1998); *State v. Cassell*, 590 S.E.2d 333 (N.C. Ct. App. 2004); *Johnson v. State*, 17 P.3d 1008 (Nev. 2001); *State v. Pruitt*, 2004 WL 3017252 (Ohio Ct. App. 2004); *Commonwealth v. Jermyn*,

18

## The Multi-Jurisdictional
## Post-*Godinez* Conflict

| | Federal Circuits | State Courts of Last Resort | Other State Appellate Courts |
|---|---|---|---|
| **Different Standard Allowed** | CA7 | CA<br>IL<br>MD<br>RI<br>UT<br>WI<br>WY | CO<br>MA |
| **Same Standard Required** | CA3<br>CA4<br>CA5<br>CA8<br>CA9<br>CA10<br>CADC | CT<br>GA<br>IN<br>IA<br>MN<br>MO<br>OH<br>PA<br>SD<br>TX<br>WA | TN |

709 A.2d 849 (Pa. 1998); *Carrillo v. State*, 2006 WL 2925378 (Tex. Crim. App. 2006); *Moore v. State*, 999 S.W.2d 385 (Tex. Crim. App. 1999); *Edwards v. Commonwealth*, 644 S.E.2d 396 (Va. Ct. App. 2007); *State v. Bean*, 762 A.2d 1259 (Vt. 2000); *State v. Pollard*, 657 A.2d 185 (Vt. 1995); *State v. Marquardt*, 705 N.W.2d 878 (Wis. 2005).

19

## II. Review is Warranted because Allowing the Mentally Impaired to Represent Themselves at Trial Erodes the Integrity of the Criminal-Justice System

As noted, the trial-competence standard of *Dusky* requires only that a criminal defendant be aware of the charges against him and be able to assist counsel with his defense. *See Dusky v. United States*, 362 U.S. 402, 402 (1960). This inquiry, however, explicitly presumes that the defendant will *not* represent himself; it therefore cannot conceivably be understood to test whether the defendant has the minimum cognitive capacity to do so. App. 6a. There is no reason, as a matter of logic or common sense, why someone who is competent to assist counsel (and therefore can stand trial) has the minimum capacity to present a case such that the resulting trial comports with due process.

The criminal-justice system at a minimum is supposed to be fair. *See Ford v. Wainwright*, 477 U.S. 399, 424 (1986) (Powell, J., concurring) (explaining that "fundamental fairness is the hallmark of the procedural protections afforded by the Due Process Clause"). Affording self-representation to the mentally impaired undermines this important goal and often leaves the system with a black eye. Although criminal defendants have different motivations for seeking to represent themselves, many *pro se* defendants "are so totally out of touch with reality that they believe they can do it all themselves." John F. Decker, *The Sixth Amendment Right to Shoot Oneself in the Foot: An Assessment of the Guarantee of Self-Representation Twenty Years After* Faretta, 6 Seton Hall Const. L.J. 483, 487 (Spring 1996). Frequently, those who choose self-representation are the least up to the task, leading to trials that "make a mockery of justice." *Id.* at 485.

1. Take the trial of Scott Panetti, which this Court reviewed just last term. *See Panetti v. Quarterman*, __ U.S.

20

__, 127 S. Ct. 2849 (2007). After a jury found Panetti competent to stand trial, "Mr. Panetti experienced his 'April Fool's Day revelation' that God had cured his schizophrenia." *Panetti*, Pet. Br. at 10. Thus "cured," Panetti asked to represent himself, and the court said yes. *See id.* at 11. Panetti thereafter came to court wearing a cowboy outfit described by his standby counsel as a "'Tom Mix' style costume like an old TV western . . . It was a joke. It was like out of a dime store novel." *Id.* at 11 n.9. Panetti's defense was "not guilty by reason of insanity," and he explained to the jury in his opening statement that "only an insane person could prove insanity." *Id.* at 11. Panetti asked the court "for over 200 subpoenas, including John F. Kennedy, the Pope, and Jesus." *Id.*

Panetti explained during voir dire that "[t]he death penalty doesn't scare me, sure but not much. Be killed, power line, when I was a kid. I've got my Injun beliefs as a shaman. I sent the buffalo horn to my sister. Adjustment, Jesus wrote . . . I was named 'He who doesn't cry' because I didn't cry when I should have, and I must admit, though, in Gillespie County Jail when I was in my little suicide box where there was an old boy committed suicide, I went through about a week of pretty much scuba diver's tears; although, I don't scuba." *Id.* at 12. Panetti questioned prospective witnesses about nonsensical things like belt buckles, explaining that this line of questioning "has to do with jailhouse religion. It has to do what some men would do for a belt buckle. It has to do with the difference between a rodeo hand and a buckaroo poet. It has to do with my whole outlook and this will come up, God forbid, in the punishment stage." *Id.* at 13. Panetti assumed an alternate personality named "Sarge" when he testified about the crime. *See id.* at 14. Panetti's standby counsel summarized this behavior at trial as "'bizarre'" and "'scary,'" making "the trial 'truly a judicial farce, and a mockery of self-representation.'" *Panetti*, 127 S. Ct. at 2849.

21

Not surprisingly, Panetti received the death penalty. *See id.* at 2847-48. Over 12 years later, after several rounds of appeals in the Texas state courts and two prior petitions for certiorari, the Court finally interceded because it appeared an insane man was about to be executed. *See id.* The case is still not over—several more rounds of trial and appellate litigation over his mental state are in the offing. *See id.* at 2863 (remanding so that the district court could develop an evidentiary record to resolve constitutional claims). This entire quagmire over Panetti's punishment might have been avoided had Panetti not been allowed to represent himself in the first instance. *Cf. Panetti v. Cockrell*, 2003 WL 21756365, at *3-4 (5th Cir. 2003) (rejecting the argument that *Panetti* was incompetent to waive counsel in light of *Godinez*).

Unfortunately, Scott Panetti is just one example. Consider also the case of Colin Ferguson, the Long Island Railroad killer, who fired his lawyers for questioning his competence and told the jury that there was a 93-count indictment against him only because the crimes occurred in 1993. *See* Decker, 6 Seton Hall Const. L.J. at 487 n.7. Or serial killer Ted Bundy who, instead of presenting mitigating evidence at trial, "insisted on performing a mock wedding ceremony with his fiancée" in front of the jury. *See Bundy v. Dugger*, 816 F.2d 564, 567 (11th Cir. 1987); *see also Bundy v. Dugger*, 850 F.2d 1402, 1412 (11th Cir. 1988). These cases demonstrate the problems inherent in allowing the mentally ill to represent themselves and give sad substance to Justice Blackmun's dissent in *Godinez*: "To try, convict, and punish one so helpless to defend himself contravenes fundamental principles of fairness and impugns the integrity of our criminal justice system." *Godinez v. Moran*, 509 U.S. 389, 417 (1993) (Blackmun, J., dissenting).

These also are only a few of the self-representation cases that have captured the public eye—and are likely the tip of iceberg when it comes to mentally impaired but legally

22

competent defendants who have chosen to try their own cases. The consequences often are disastrous for both the defendants and the integrity—not to mention dignity—of the criminal-justice system.

2. Unfortunately, attempts to gather empirical data about *pro se* defendants, their reasons for choosing self-representation, and their success rates have not been fruitful. *See, e.g.*, Erica J. Hashimoto, *Defending the Right of Self-Representation: An Empirical Look at the Pro Se Felony Defendant*, 85 N.C. L. Rev. 423, 441-46 (Jan. 2007) (presenting results of an empirical study that the author acknowledged to be flawed because of a small sample size, missing data, and selection bias). But there can be no doubt that mentally ill defendants all too frequently attempt self-representation, with bad outcomes for themselves and the entire criminal-justice system. *See* n.1, *supra*.

Moreover, the lack of aggregate quantitative data hardly matters to a public that learns the stories of defendants such as Panetti—and perhaps one day Edwards if he ultimately represents himself at trial. Allowing mentally ill defendants to elect self-representation casts doubt on the integrity of the criminal-justice system, pure and simple. *See, e.g.*, Jessica McBride, *How Can an Insane Man Defend Himself?*, Milwaukee J. & Sentinel, Feb. 15, 2004, at J1, *available at* 2004 WLNR 4682593, at *4 (quoting a doctor who had treated Panetti as saying, "My God. How in the world can our legal system allow an insane man to defend himself?"); Ralph Blumenthal, *Insanity Question Lingers as Texas Execution is Set*, N.Y. Times, Feb. 4, 2004, at A12, *available at* 2004 WLNR 5530429, at *2 (quoting the executive director of the defender service as saying, "Allowing a schizophrenic in a cowboy costume to represent himself in a death penalty case gives new meaning to the term 'frontier justice.'"); Howard Wiit, *Inmate Granted Stay*, Chi. Trib., Feb. 5, 2004, at 16, *available at* 2004 WLNR 19909681, at *3 ("Some of Panetti's former doctors and lawyers, who

23

watched in the courtroom as Panetti rambled disjointedly, badgered witnesses and menaced the jury, later pronounced the trial a 'farce' and a 'circus.'").

There must be some limit on *Faretta* in order to ensure that all defendants, even those who are mentally ill, receive fair trials, and in order to assure the public of the same.

3. Limiting *Faretta* rights for the mentally impaired would not require a rollback of precedent or a leap of logic. The Court in many ways has already laid the doctrinal groundwork. *Faretta* itself recognized that, under a long line of cases, "the help of a lawyer" has been regarded as "essential to assure the defendant a fair trial." *See Faretta v. California*, 422 U.S. 806, 832-33 (1975). The Court nonetheless recognized a right to waive trial counsel, but in doing so, it principally rejected the notion that a defendant's lack of technical legal competence could be a reason to deny waiver. *See id.* at 836. That holding is not implicated here. The State asks only that the Court conclude that, at some point, permitting a defendant with profound mental impairments to represent himself at trial may tax the fairness of the criminal-justice system more than it can bear, even if the defendant is legally competent to stand trial.

Nor does *Godinez* present doctrinal obstacles. *Godinez* recognized a difference between competency to *waive* the right to counsel and competency to *represent* oneself. *See Godinez*, 509 U.S. at 396. It held that, as far as the Due Process Clause is concerned, a defendant who is competent to stand trial *need* be no more competent to waive the right to counsel. *See id.* at 399. The Court in *Godinez* did not, however, purport to create new constitutional law regarding a trial-competent defendant's inherent mental capacity to represent himself. It merely quoted *Faretta* for the point that lack of technical competence in the law cannot limit the right of self-representation. *See id.* at 399-400. The question remains whether any *other* limits on *Faretta* rights, such as

24

where their exercise would undermine the integrity of the proceedings, may exist.

In *Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 161-62 (2000), the Court suggested that some such limits might in fact exist when it refused to apply *Faretta* to appellate proceedings.  The Court reasoned that the right to self-representation is not absolute because "the defendant's interest in acting as his own lawyer" is at times outweighed by "the government's interest in ensuring the integrity and efficiency of the trial." *Id.* at 162.  The Court even suggested that future cases could further limit the right of self-representation where it squarely conflicts with fundamental fairness and due process. *See id.* at 162-63.

This is just such a case.  Indeed, it is precisely because trying a mentally impaired defendant without counsel so squarely conflicts with fundamental fairness that many state courts already impose minor limits on *Faretta*. *See* Part I-1, *supra*.  Further, one federal circuit has repeatedly and openly invited the Court to address this clash of criminal due-process rights that *Faretta* sometimes precipitates. *See United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004) (noting the "difficulty inherent in preserving . . . simultaneously" the *Faretta* right and the "paramount right to a fair and reliable trial"); *United States v. Hernandez*, 203 F.3d 614, 625 & n.18 (9th Cir. 2000) (questioning the wisdom of *Faretta* given its tension with the right to counsel).

The Court should therefore take this case to resolve whether the Sixth Amendment and fundamental fairness permit courts to deny self-representation to defendants competent to stand trial under *Dusky*, but too mentally impaired to conduct a lucid defense alone.

25

**III.    Edwards was Twice Found Incompetent Even to Stand Trial, Which Makes this an Excellent Case for Considering Whether Courts May *Ever* Deny Defendants Self-Representation at Trial**

Because of Edwards's borderline legal competency, this case is an especially useful vehicle for examining the limits of the *Faretta* right with respect to the mentally impaired. App. 14a. The Court may use this case to examine whether just about *any* record of mental impairment can justify denying a legally competent defendant the right to waive counsel. App. 14a ("The record in this case . . . presents an opportunity to revisit the holdings of *Faretta* and *Godinez*, if the Supreme Court of the United States decides that is to be done.").

To recap, throughout his nearly six years in state custody awaiting trial—either in the Marion County Jail or at Logansport State Hospital—Edwards has demonstrated a fundamental inability to communicate lucidly with the court—and at times even with his lawyer. His communication deficiencies have twice scuttled Edwards's trial under the minimal *Dusky* competency standard. (Ed.App. 168, 435-39). Edwards has now regained enough cognition to consult with his lawyer, but that is not nearly enough to communicate coherently with the court or a jury.

For example, as trial commenced and the court was considering Edwards's motion to dismiss his attorney, Edwards repeatedly interjected with gibberish objections— even after being told by the court that it was not his turn to speak. App. 33a-40a. Yet, during this same court session, Edwards consulted with counsel regarding whether, if allowed to represent himself, he would present the insanity defense. App. 34a. With little apparent trouble, Edwards was able to explain to his counsel that he would instead present a theory of self-defense. App. 34a-35a. Thus, while

26

Edwards demonstrated that he *could not* communicate coherently with the court (or conform to courtroom rules and procedures), he also demonstrated that he *could* assist his lawyer—and thus that he remained legally competent under *Dusky.*

This case, therefore, provides the Court with an excellent record for determining whether a criminal defendant who is so mentally impaired that he cannot communicate cogently with a court or a jury, but who is nonetheless legally competent to stand trial, must be permitted to represent himself at trial.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

STEVE CARTER
Attorney General

Office of the Indiana
  Attorney General
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, IN  46204
(317) 232-6201

THOMAS M. FISHER*
Solicitor General
JULIE A. HOFFMAN BRUBAKER
JUSTIN F. ROEBEL
Deputy Attorneys General

*Counsel of Record*

*Counsel for Petitioner*

Dated:  August 15, 2007